UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

STEVEN A. KEGEL,

Plaintiff,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, et al.,

Defendants.

3:06-CV-00093-LRH-VPC

ORDER

Presently before the court is Defendants Brown & Williamson Tobacco Corporation, et al.'s (collectively, "Defendants") Motion for Summary Judgment (#115[1]). Plaintiff Steven Kegel has filed an opposition (#128) to which Defendants replied (#135). Also before the court are Defendants' Errata to Reply in Support of Summary Judgment (#137) and Amended Statement of Undisputed Facts (#139). In response, Plaintiff has filed a motion to strike both documents (#140).

**I. Facts and Procedural History**

This case arises out of Plaintiff's termination from employment with Defendant Brown & Williamson Tobacco Corporation ("Brown & Williamson") and Defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds"). Plaintiff is a resident of Washoe County, Nevada. Defendant R.J. Reynolds is a North Carolina corporation doing business in the State of Nevada. Defendant Brown

[1] Refers to the court's docket number.

& Williamson was a Delaware corporation that conducted business in the State of Nevada. The remaining Defendants are Reynolds American Incorporated Employee Benefits Committee and various benefit plans organized by Brown & Williamson, R.J. Reynolds, and Reynolds American, Incorporated.[2]

In October of 1980, the American Tobacco Company ("American Tobacco") hired Plaintiff as a sales representative. In January of 1995, American Tobacco merged with Brown & Williamson. Following the merger, Plaintiff continued to work for Brown & Williamson as a territory sales manager. In hiring Plaintiff, Brown & Williamson appears to have agreed to maintain October of 1980 as Plaintiff's starting date of employment with Brown & Williamson.

As a territory sales manager, Plaintiff drove to stores throughout rural Nevada to sell Brown & Williamson tobacco products. His written job description provided that the position required "heavy daily travel" and physical demands including, "bending, squatting, reaching, and lifting up to 40 pounds." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 9.) To complete his duties, Plaintiff was sometimes required to travel by car six to eight hundred miles per week.

**A. Worker's Compensation Claims**

Beginning in 1997, Plaintiff suffered several work-related injuries. First, in September of 1997, Plaintiff fractured his wrist while changing a tire on his vehicle. As a result of the injury, Plaintiff filed a worker's compensation claim. Allegedly, Plaintiff also began experiencing lower back pain after the accident, but he did not include the symptom on his worker's compensation claim. On October 7, 1998, doctors diagnosed Plaintiff with "[a]cute left S1 radiculopathy secondary to a herniated disc" and "discogenic low back pain." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 15.) The doctors placed Plaintiff on a comprehensive physical therapy program. As a part of the program, Plaintiff was permitted to swim, walk on a treadmill, and use a stationary bike.

---

[2] The court's jurisdiction is based both on diversity of citizenship and on the resolution of a federal question, namely the violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1462.

On April 1, 1999, Plaintiff suffered a second job-related injury when his vehicle was rear ended, and he suffered injuries to his back and neck. Plaintiff filed a worker's compensation claim relating to the incident. The worker's compensation carrier initially accepted Plaintiff's claim in part, covering Plaintiff's cervical and lumbosacral strain, but eventually extended the claim to cover degenerative changes at the L4-5 and L5-S1. Plaintiff's claim remained open until March of 2006 when he received a permanent partial disability award.

On January 9, 2003, Plaintiff suffered a third job-related injury. While removing a large neon sign from the window of a client's store, Plaintiff heard a pop and felt pain shoot into his neck and upper back. Initially, Plaintiff was diagnosed with cervical and thoracic strain. Plaintiff filed a worker's compensation claim, and the worker's compensation carrier accepted a claim for "mild thoracic spine strain." (Pl.'s Opp. (#128), Ex. 50.)

As Plaintiff's pain failed to improve in response to treatment and as driving "could certainly be contributing to a lot of muscular tension in the cervical and thoracic spine," on May 14, 2003, Plaintiff's doctor restricted his work duties to driving no more than thirty minutes at a time. (Pl.'s Opp. (#128), Ex. 50 at 56.) On October 9, 2003, Plaintiff attended an Independent Medical Evaluation ("IME") scheduled by the worker's compensation carrier. The examining physical diagnosed Plaintiff with cervical spondylosis,[3] cervical discogenic neck pain with referral to the thoracic area,[4] and lumbar spondylosis at L5-S1 with chronic discogenic low back pain. Plaintiff eventually accepted a permanent partial disability award for the claim.

///

///

///

///

---

[3] Spondylosis is a disorder caused by abnormal wear on the cartilage and bones.

[4] Discogenic pain is pain cased by degeneration of intervertebral discs.

**B. Merger**

In October of 2003 Brown & Williamson announced a potential "merger"[5] with R.J. Reynolds, which would result in a new company, Reynolds American, Incorporated ("Reynolds American"). Brown & Williamson expected the merger to be complete in August of 2004.

In anticipation of the merger, Brown & Williamson developed a severance plan for salaried employees. Under the basic severance package, an employee would receive one month pay for every year of service, with a minimum of three months and a maximum of fifteen months. The plan also provided that a termination for cause would result in a loss of eligibility for the severance benefits. The plan defined "cause" as a termination for gross misconduct, including dishonesty.

The Severance Plan also addressed retiree health care. Generally, to qualify for retiree health care an employee would have to reach the age 55 and have ten years of service. Recognizing that a number of employees would not qualify under this plan upon the merger, the Severance Plan gave employees the option of selecting an alternative severance plan, which called for a reduction in the severance payment in exchange for a retiree health care component. These plans came in several types, including a "Rule of 70" plan, a "Rule of 65" plan, and a "Rule of 60" plan.

Under the Rule of 70 plan, employees not otherwise eligible for retiree medical coverage who were fifty years of age or older at their release date, who had served at least ten years, and whose age and qualifying service added to seventy years would have a one-time option to substitute fifty percent of their severance pay in exchange for retiree medical coverage. As an alternative, employees could take the full severance, and Brown & Williamson would pay the full cost of employee coverage until the age of sixty-five. At the time Brown & Williamson announced the Severance Plan, Plaintiff was forty-eight years old and had completed approximately twenty-three years of service. Having not reached the age of fifty, Plaintiff did not then qualify for the Rule of

[5] The exact contours of the business arrangement is not clear. Regardless, in this order the court will refer to the arraignment as a "merger."

70 plan.

The Rule of 60 plan applied to individuals employed by Brown & Williamson prior to July 1, 1994. Under the rule, employees had to have completed at least ten years of qualifying service, and the employee's age plus qualifying years of service had to equal sixty years or more. If these requirements were met, the employee could retire at any time and begin receiving a pension after the employee reached the age of fifty. Upon announcing the merger, Defendants informed Plaintiff that he did not qualify for the Rule of 60 plan because he was not hired by Brown & Williamson until 1995 and therefore was not a Brown & Williamson employee prior to July 1, 1994, as required by the plan.

**C. Short-Term Disability**

In June of 2004, Plaintiff saw his internist, Dr. Jay Schroeder. Dr. Schroeder had evaluated and treated Plaintiff's chronic back and neck pain since October of 1998. Dr. Schroeder noted that sitting increased Plaintiff's pain and that Plaintiff "needs off work until he has back surgery." (Defs.'s Mot. Summ. J. (#115), Exs. L, M.)

Plaintiff then informed Brown & Williamson that as a result of his back injuries he might have to have surgery which would require him to take short-term disability leave. Plaintiff asked how this would affect the severance offer or his ability to receive a job offer with the new company, Reynolds American. Brown & Williamson responded that participation in the short term disability program would not impact the severance offer or impact those who would be offered ongoing employment with the new company. They stated, "If you do not receive an offer of ongoing employment, and you are receiving payments under the [short term disability] program at the time you receive notice of employment termination, your Release Date will be postponed until you are released to return to work or you exhaust your short term disability benefits." (Defs.' Mot. Summ. J. (#115), Ex. H.) Under the short term disability plan, Plaintiff could claim up to twelve months of short-term disability benefits. During that time Plaintiff would be paid his full salary.

In June of 2004, Plaintiff went on short term disability leave pending back surgery. On June 8, 2004, Dr. Jacob Blum, a consultant for Brown & Williamson wrote to Dr. Schroeder requesting that Dr. Schroeder release Plaintiff for light work. Dr. Blum based this request on his review of Plaintiff's medical records and job duties. Dr. Blum believed that Plaintiff could continue working if he was in a sedentary position. In response to Dr. Blum's request, on June 17, 2004, Dr. Schroeder informed Dr. Blum that "Plaintiff is not to continue his position until further notice." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 79.)

On June 21, 2004, Dr. Blum informed Judy Greenwell, R.J. Reynolds' Senior Benefit Administrator, that Plaintiff's doctor had "refused attempts at accommodation in terms of lifting." (*Id.*, Ex. 78.) Dr. Blum concluded that "there is little other choice th[a]n waiting for the surgical consultation and/or arranging an IME." (*Id.*) Throughout June and July of 2004, Dr. Schroeder maintained that Plaintiff remain off work until his back issues were resolved. Dr. Schroeder also instructed Plaintiff to engage in physical therapy, including strengthening exercises.

On July 21, 2004, Plaintiff traveled to California to see a specialist. The specialist placed Plaintiff on a wait list to receive surgery sometime in October of 2004. The specialist further recommended that Plaintiff have a discogram to determine the proper course of treatment.[6]

On August 22, 2004, Dr. Blum wrote a second letter to Ms. Greenwell indicating that Plaintiff had failed to comply with the medical recommendations of his doctors because Plaintiff had yet to undergo the recommended discogram. As a result, Dr. Blum concluded that Plaintiff's "continued eligibility for short term disability benefits [was] in doubt." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 87.)

Ms. Greenwell then informed Plaintiff that if he could supply R.J. Reynolds with the results of the discogram by September 3, 2004, his claim would be re-evaluated. If Plaintiff failed to provide the results by that date, Plaintiff's employment would end effective August 31, 2004. In

---

[6] A discogram is an enhanced x-ray examination of the pad of cartilage that separate the vertebrae.

response, Plaintiff notified Ms. Greenwell that because of Plaintiff's increasing complaints about lower back pain, the specialist had recommended that Plaintiff undergo an MRI before undergoing the discogram. Plaintiff informed Ms. Greenwell that he had scheduled an MRI for September 7, 2004, an appointment with Dr. Schroeder on September 8, 2004, and an appointment with the specialist on September 15, 2004.

In October of 2004, Dr. Blum scheduled an IME of Plaintiff. The company instructed the physician conducting the examination only to determine whether Plaintiff could perform sedentary work and not to consider a "whole body [percentage] impairment rating, differential diagnosis, and/or treatment plan." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 96.) After reviewing Plaintiff's medical records and conducting a physical examination, the doctor concluded that Plaintiff was "disabled totally from gainful employment." (*Id.*, Ex. 98.)

Dr. Blum reviewed the doctor's report and found it insufficient. In particular, Dr. Blum noted inconsistencies in the history provided to the physician, particularly relating to Plaintiff's use of pain medication. In addition, Dr. Blum noted that the "AMA Guides to the Evaluation of Permanent Impairment, required the evaluation to be based on physical findings, not on the subjective report of pain." (Defs.' Mot. Summ. J. (#115), Ex. S.) However, as noted, Dr. Blum specifically instructed the doctor not to evaluate Plaintiff's impairment and to limit the examination to determining whether Plaintiff could perform sedentary work.

Upon completion of the merger, the responsibility for former Brown & Williamson employees on short-term disability was transferred to R.J. Reynolds. R.J. Reynolds amended the short-term disability plan such that the Administrator under the plan became the medical director of Reynolds American, Dr. J. Kerry Collins. In addition, R.J. Reynolds amended the plan such that, effective February 21, 2005, the Administrator's determination regarding eligibility for benefits under the plan would be final and binding.

In January of 2005, Dr. Collins scheduled a second examination for Plaintiff. Dr. Collins

wrote to the examining doctor, stating that Plaintiff had been out of work since 2003.[7] Dr. Collins also told the doctor that Plaintiff had been a "no show" for several scheduled surgeries. On January 13, 2005, Plaintiff underwent a Functional Capacities Evaluation. Based on a variety of physical tests, the doctor concluded that Plaintiff "could not return to his previous position in sales with the lifting and driving requirement." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 103.)

R.J. Reynolds rejected the examining doctor's conclusion, reasoning that Plaintiff had intentionally limited his exertion and abilities during the examination. As a result, R.J. Reynolds concluded that the examination lacked validity and reliability. R.J. Reynolds did not discuss their concerns with the evaluator.

Dr. Collins then scheduled Plaintiff for another examination. Before Plaintiff underwent the examination, Dr. Collins contacted the evaluator and informed the evaluator that Dr. Collins' predecessor, Dr. Blum, had "felt that [Plaintiff's] symptoms were probably exaggerated and the treating doctors were simply reiterating what [Plaintiff] was telling them." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 104.) He further stated, "[Plaintiff] does have an incentive to stay out of work until spring when he would become eligible for a long-term disability package through the company." (*Id.*)

On January 25, 2005, Plaintiff underwent the examination. Based on a "severe paraspinal spasm with limiting range of motion," Plaintiff's report of significant low back pain, and findings of an MRI, the examiner concluded that Plaintiff had exhausted his non-operative care and was an excellent candidate for surgery at L5-S1.

Beginning in December of 2004, Dr. Collins arranged for surveillance of Plaintiff. On February 1, 2005, Plaintiff was videotaped driving his vehicle to the local health club and entering the health club. On February 22, 2005, Plaintiff was allegedly seen shoveling snow. Plaintiff denies shoveling snow, and Plaintiff's wife states that she has to shovel snow because her husband

---

[7] In reality, Plaintiff had worked until June of 2004.

cannot.

On February 23, 2005, Plaintiff was videotaped driving his wife to work and driving from Incline Village, Nevada to Reno, Nevada, where Plaintiff shopped and then returned to Incline Village. The following day, Plaintiff was videotaped driving to the health club. Plaintiff then entered the health club, and over an hour and a half period Plaintiff was videotaped working on various weight lifting machines and jogging on the treadmill for twenty minutes. During the weight lifting exercises, the individual running the videotape allegedly observed Plaintiff lift a variety of weight from twenty pounds to a 155-pound barbell.[8]

**D. Termination**

On March 8, 2005, based on the alleged discrepancies between the surveillance and Plaintiff's representations regarding his pain and physical, R.J. Reynolds informed Plaintiff that he was no longer eligible for short term disability benefits. The letter stated that Plaintiff had a right to appeal the denial of his short term disability benefits. In addition, in a separate letter R.J. Reynolds informed Plaintiff that effective March 8, 2005, his employment was also "terminated"[9] and that he was no longer eligible for Special Severance Benefits because his termination was for cause.

It is unclear who made the decision to terminate the disability benefits. Dr. Collins, as the Administrator of the short term disability plan, was responsible for determining whether an employee was entitled to short term disability benefits. However, Dr. Collins denies any involvement in the decision to terminate Plaintiff's disability benefits. Ella Long testified that the

---

[8] Plaintiff disputes the amount of weight Defendants claim he lifted. Plaintiff notes that from the videotape it is not clear how much weight he lifted and the individual running the videotape could not recall how he determined how much weight Plaintiff had lifted. Plaintiff also disputes that it was him jogging on the videotape.

[9] R.J. Reynolds never offered Plaintiff a position. However, as discussed above, because Plaintiff was on short term disability at the time of the merger, Plaintiff's termination date was extended to the completion of Plaintiff's short term disability.

decision to terminate Plaintiff's disability benefits was a collaborative decision between Ms. Long, her superior Steve Karr, and Dr. Collins.

On March 16, 2005, Plaintiff sent letters to R.J. Reynolds employees Judy Greenwell, Senior Benefits Administrator, Shannon Tremblay, Senior Management of Sales Employment Practices, and Ella Long, Senior Management of Employment Practices, requesting an appeal of the termination of short term disability benefits. In addition, Plaintiff requested "all copies of records, documentation that supported the decision to terminate me. Specifically copies of records, documentation, that support the statement that I have misrepresented to the Company my medical condition and physical limitations . . . ." (Pl.'s Opp. Mot. Summ. J. (#128), Exs. 115, 116, 117.) In response to this request, Ella Long explained to Plaintiff the reasons for his termination, but did not provide Plaintiff with any documents. She also informed Plaintiff that the termination of his short term disability benefits was final and not subject to appeal.

On January 12, 2006, Plaintiff sent a written request to Ella Long, Senior Management of Employment Practices, seeking the name and a copy of "R.J. Reynolds/Reynolds American Employee Benefits Plan." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 132.) On January 17, 2006, Jennie Beasley, Director of Corporate and Benefit Compliance, responded, informing Plaintiff she needed to know to "which kind of benefit plan (pension, medical, 401(k), disability, etc.)" Plaintiff was referring. (*Id.*) On January 27, 2006, through his attorney, Plaintiff again sent a letter seeking the requested information. On February 22, 2006, Ms. Beasley responded, identifying the employee benefit plans in which Plaintiff was eligible to participate prior to his termination. Ms. Beasley included in her response copies of each plan.

## II. Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

**III. Discussion**

In the fourth amended complaint (#109), Plaintiff alleges the following claims for relief: (1) wrongful termination; (2) breach of implied covenant of good faith and fair dealing; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) "recovery of

benefits under Employee Benefit Plan and Declaration of Rights"; (6) termination for exercise of rights under employee benefit plans in violation of 29 U.S.C. § 1140; (7) defamation; (8) breach of contract; and (9) breach of implied covenant of good faith and fair dealing. The court will discuss each of these claims below.

**A. Tortuous Discharge**

In the complaint, Plaintiff first alleges Defendants Brown & Williamson and R.J. Reynolds terminated Plaintiff in retaliation for Plaintiff's filing worker's compensation claims. Plaintiff maintains that this retaliation "constitutes a wrongful and tortuous discharge . . . in violation of the fundamental public policy of the State of Nevada . . . ." (Fourth Am. Compl. (#109) ¶ 48.)

An employer commits a tortuous discharge by terminating an employee for reasons that violate public policy. *D'Angelo v. Gardner*, 819 P.2d 206, 212 (Nev. 1991). Although the tortuous discharge claim arises out of the employer-employee relationship, such a claim does not depend on a contract of continued employment between the employee and the employer. *Id.* at 216. Instead, "The essence of a tortuous discharge is the wrongful, usually retaliatory, interruption of employment by means which are deemed to be contrary to the public policy of the state." *Id.* Nevada has recognized that terminating an employee in retaliation for filing a worker's compensation claim violates public policy and supports a claim for tortuous discharge. *Hansen v. Harrah's*, 675 P.2d 394 (Nev. 1984).

To establish a claim for tortuous or retaliatory discharge, Plaintiff must demonstrate that retaliation for the protected speech was the cause of his termination. *Allum v. Valley Bank of Nev.*, 970 P.2d 1062, 1066 (Nev. 1998). Thus, in *Allum*, the Nevada Supreme Court held, "[R]ecovery for retaliatory discharge under state law may not be had upon a 'mixed motive' theory; thus, a plaintiff must demonstrate that his protected conduct was *the* proximate cause of the jury." *Id.* (emphasis in original).

Even, as it must, viewing the evidence in the light most favorable to Plaintiff and making all

reasonable inferences in Plaintiff's favor, the court will grant Defendants' motion for summary judgment as to this claim. Plaintiff has failed to identify any evidence indicating that the worker's compensation claims played a role in Defendant's decision to terminate Plaintiff. Moreover, Plaintiff fails to provide any evidence indicating that the filing of such claims was the proximate cause of his termination rather than one of many causes. Instead, Plaintiff himself admits, "Reynolds wanted to terminate me for many different reasons, one of them included my worker's compensation claim . . . ." (Defs.' Mot. Summ. J. (#115), Ex. G, 266:3-5.) Summary judgment as to the tortuous discharge claim is therefore appropriate.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiff's second claim for relief alleges that an employment agreement between Plaintiff and Defendants Brown & Williamson and/or R.J. Reynolds contained an implied covenant of good faith. Plaintiff contends that Defendants breached this implied covenant by discharging Plaintiff in retaliation for his worker's compensation claims.

A claim of bad faith discharge may lie where a tenured employee who enjoyed a right to continued employment was terminated by an employer in bad faith. *See K-Mart Corp. v. Ponsock*, 732 P.2d 1364, 1369-70 (Nev. 1987) (recognizing a bad faith discharge claim "in this fact-specific instance of discharge by a large, nationwide employer of an employee in bad faith for the improper motive of defeating contractual retirement benefits."). For a bad faith discharge claim to apply, the plaintiff must establish the following: (1) an enforceable contract; (2) a special relationship between the tortfeasor and the tort victim; and (3) the employer's conduct must go "well beyond the bounds of ordinary liability for breach of contract." *Martin v. Sears, Roebuck and Co.*, 899 P.2d 441, 555 (Nev. 1995).

Defendants argue Plaintiff's at-will employment precludes any "bad faith" claim under Nevada law. Indeed, in *Martin* the Nevada Supreme Court held that "breach of contract and bad faith discharge are not applicable to at-will employment." *Id.* Plaintiff's cites *Ponsock* for the

proposition that a bad-faith discharge claim can arise out of an at-will employment arrangement. However, Plaintiff's reliance on *Ponsock* is misplaced. The parties in *Ponsock* stipulated to an employment contract. *Ponsock*, 732 P.2d at 1366 n.1. Here, the parties have not stipulated to an employment agreement, and Defendants expressly deny that any such agreement existed.

Nonetheless, Plaintiff maintains that the short term disability benefits plan created an implied employment agreement. He argues, "[the short term disability benefits] were part of Plaintiff's express employment agreement with Defendant whereby Plaintiff agreed to provide certain labor services in exchange for monetary compensation in the form of a salary and benefits." (Pl.'s Opp. Mot. Summ. J. (#128) at 51.)

Cases recognizing an implied employment contract have done so in reference to employee handbooks or other evidence indicating an agreement between the parties that the employer will terminate the employee only for cause. *See Southwest Gas Corp v. Ahmad*, 668 P.2d 261 (1983). Here, the short term disability plan provides, "The Company assumes no obligation to continue this Plan in effect, and reserves the right at any time thereafter to terminate the Plan in whole or in part." (Defs.' Mot. Summ. J. (#115), Ex. I.) Thus, the language of the plan indicates that the company could terminate the disability benefits at any time and for any reason. Further, the language of the plan appears to exclude the plan from compensation packages for service rendered and instead indicates that the distribution of benefits under the plan was in the discretion of the company.

Thus, here as in *Martin*, Plaintiff has offered no evidence of a contract beyond his own subjective expectations of long term employment. "Such expectations are insufficient to substantiate an express or implied agreement for continuing employment." *Martin*, 899 P.2d at 555. Because Plaintiff was an at-will employee, his claim for bad faith discharge must fail. Accordingly, the court will grant summary judgment with regard to this claim.

///

**C. Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress, the plaintiff must establish the following: (1) "extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress"; (2) severe or extreme emotional distress; and (3) actual or proximate causation. *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981) (citation omitted).

Extreme and outrageous conduct "is that which is 'outside all possible bounds of decency' and is regarded as 'utterly intolerable in a civilized community.'" *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citations omitted). This is not such a case. Rather, this case involves ordinary tort and breach of contract claims. The court finds no allegations in this case that amount to extreme and outrageous conduct and Plaintiff has pointed to no specific evidence to support such a claim. Thus, summary judgment is appropriate on this claim.

**D. Negligent Infliction of Emotional Distress**

"[I]n cases where emotional distress damages are not secondary to physical injuries, but rather, precipitate physical symptoms, either a physical impact must have occurred, or in the absence of physical impact, proof of 'serious emotional distress' causing physical injury or illness must be presented." *Barmettler v. Reno Air, Inc.*, 856 P.2d 1382, 1387 (Nev. 1998). General physical or emotional discomfort are insufficient to establish a claim for negligent infliction of emotional distress. *Id.* (citation omitted).

Here, there is no evidence of physical impact or serious emotional distress causing physical injury or illness. In the complaint, Plaintiff alleges that he suffered "shame, despair, humiliation, embarrassment, depression, and emotional distress." (Fourth Am. Compl. (#109) ¶ 65.) Nothing in the record indicates that Plaintiff suffered physical injury or illness either before or after the alleged emotional distress. Accordingly, summary judgment is appropriate on this claim.

///

///

**E. Employment Retirement Income Security Act**

In the complaint, Plaintiff alleges a variety of violations of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1462. In particular, Plaintiff appears to allege the following ERISA-based claims for relief: (1) a claim for benefits under the Short Term Disability Plan, the Welfare and Fringe Benefit Plan, the Retirement Plan, and the Special Severance Benefits Plan pursuant to 29 U.S.C. § 1132(a); (2) failure to provide information as required by 29 U.S.C. § 1132(c); (3) equitable estoppel; and (4) wrongful termination in violation of 29 U.S.C. § 1140. The court will address each of these claims below.

**1. Termination of Short Term Disability Benefits**

As a preliminary matter, Defendants argue the short term disability plan is not an employment benefit plan covered by ERISA. In relevant part, ERISA defines an "employee benefit plan" as an "employee welfare benefit plan . . . ." 29 U.S.C. § 1002(3). An employee welfare benefit plan is "any plan, fund, or program which was . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." 29 U.S.C. § 1002(1).

Defendants do not dispute that the short-term employment plan fits within the definition of an employee benefit plan or an employee welfare benefit plan. Instead, Defendants maintain that the plan is a "payroll practice" exempted from ERISA. In pertinent part, regulations governing ERISA state, "[T]he terms 'employee welfare benefit plan' and 'welfare plan' shall not include . . . [p]ayment of an employee's normal compensation, out of the employer's general assets, on account of periods of time which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons . . . ." 29 C.F.R. § 2510.3-1(b)(2).

The short-term benefit plan fits within the outlined ERISA exemption. The plan calls for "salary continuation payments" where an absence is due to a covered illness or injury. (Defs.' Mot.

Summ. J. (#115), Ex. I.) Thus, the plan pays employee's "normal compensation" when the employee is "physically or mentally unable" to perform his or her duties. Further, the general assets of the company fund the plans. (*Id.*, Ex. HH at 24:16-19.) Accordingly, the court finds that the short term disability plan is exempted from ERISA's provisions.

Notably, Plaintiff does not appear to dispute that the short term disability plan is a payroll practice exempt from ERISA. Instead, Plaintiff contends that Defendants should be estopped from arguing that the plan is exempt from ERISA. Plaintiff argues, "Throughout this litigation, Defendants have consistently taken the position that the [plan] benefits were part of an ERISA plan and not a 'payroll plan.'" (Pl.'s Opp. Mot. Summ. J. (#128) at 56).

It is not clear that Defendants have asserted inconsistent positions during this litigation. In particular, the court notes that neither Defendants' previous motion to dismiss nor the court's order granting in part and denying in part the motion to dismiss directly address the issue of whether the short term disability plan itself was covered by ERISA. Regardless, the appropriate remedy for Plaintiff's complaint here is not to prohibit Defendants from asserting that the plan is exempt from ERISA, but instead to permit Plaintiff to amend his complaint to allege a wrongful termination claim under state law based upon the exercise of his rights under the short term disability plan.[10]

Having concluded that the short term disability benefit plan is not governed by ERISA, the court will grant summary judgment on all claims alleging ERISA violations based on the short term disability benefit plan. In addition, the court will grant Plaintiff leave to amend the complaint as described above.

///

///

---

[10] The court cautions that its ruling is in no way indicative of whether Plaintiff can in fact state a viable wrongful termination claim or whether Plaintiff has evidence to support such a claim. Instead, the court merely seeks to provide Plaintiff with an opportunity to assert the claim.

**2. Denial of Remaining Benefits**

In the complaint, Plaintiff alleges, "[his] rights and employee benefits are due and owing, including, but not limited to short term disability, health benefits, and severance pay." (Fourth Am. Compl (#109) ¶ 75.) In particular, Plaintiff identifies the Welfare and Fringe Benefit Plan, the Retirement Plan, and the Special Severance Benefits Plan as plans under which he is entitled to benefits. Plaintiff asserts Defendants R.J. Reynolds and Reynolds American's Employee Benefit Committee's decision to terminate Plaintiff's benefits was "arbitrary, capricious, unreasonable, discriminatory and not made in good faith in violation of . . . . 29 U.S.C. § 1132." (*Id.* ¶ 80.) In relevant part, § 1132 provides that a participant or beneficiary may bring a civil action to recover benefits due to him under the terms of his plan or to enforce his or her rights under the terms of a plan. 29 U.S.C. § 1132.

In the motion for summary judgment, Defendants challenge Plaintiff's claims regarding the denial of benefits solely on the grounds that Plaintiff has failed to exhaust his administrative remedies. Generally, "a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Diaz v. United Agric. Employee Welfare Benefit Plan and Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995) (citation omitted). Exhaustion is not a jurisdictional hurdle, but is instead a matter of policy whose application is within the court's discretion. *See Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980) ("[F]ederal courts have the authority to enforce the exhaustion requirements in suits under ERISA, and . . . as a matter of sound policy they should usually do so."). Although courts generally enforce the exhaustion requirement, where resorting to administrative procedures is futile or where the available remedy is inadequate, requiring exhaustion is not appropriate. *Id.* (citation omitted).

Here, Defendants argue that Plaintiff failed to exhaust his administrative remedies because he never applied for and was never denied benefits under the Welfare and Fringe Benefit Plan, the Retirement Plan, and the Special Severance Benefits Plan. Plaintiff does not dispute that he never

formally applied for such benefits. Instead, Plaintiff contends that Defendants should be estopped from asserting an exhaustion argument. He argues, "As Defendants denied [Plaintiff's] claims without ever receiving a formal application from Plaintiff for the severance benefits, there was no reason for him to submit a formal claim for his benefits under the Welfare and Fringe Benefit Plan, the Retirement Plan, or the Special Severance Benefits Plan." (Pl.'s Opp. Mot. Summ. J. (#128) at 58.)

On March 5, 2005, R.J. Reynolds sent two letters to Plaintiff notifying him that as a result of his alleged misrepresentations, he was no longer eligible to receive short term disability benefits, and he was no longer eligible for the Brown & Williamson Special Severance Benefits. On March 15, 2005, Plaintiff responded, sending letters to various R.J. Reynolds employees "request[ing] an appeal of the decision that [he has] been terminated from [short term disability] benefits." (Pl.'s Opp. Mot. Summ. J. (#128), Exs. 115, 116, 117.)

Plaintiff has not cited any evidence indicating that he appealed R.J. Reynold's decision to revoke his eligibility for Special Severance Benefits. Instead, the evidence indicates that he only sought an appeal of the termination of his non-ERISA short term disability benefits. Moreover, none of the correspondence in any way addresses Plaintiff's eligibility for the Welfare and Fringe Benefit Plan or the Retirement Plan. Thus, it appears that Plaintiff never pursued his right to receive benefits under the Special Severance Benefits Plan, the Welfare and Fringe Benefit Plan, or the Retirement Plan.

The court further finds that Plaintiff has failed to demonstrate that exhaustion here would be futile. As noted, R.J. Reynolds informed Plaintiff that he would not be able to appeal their decision to terminate Plaintiff's short term benefits. The short term disability benefit plan, as an ERISA-exempt payroll plan, did not afford Plaintiff an unrestricted right to appeal. However, the Special Severance Benefits Plan, Welfare and Fringe Benefit Plan, and the Retirement Plan are ERISA plans and do provide Plaintiff a right to appeal. Plaintiff has failed to identify any evidence

indicating that R.J. Reynolds failed to accept an appeal or otherwise consider Plaintiff's eligibility for these benefits. In addition, throughout this litigation, Defendants have not demonstrated a clear refusal to consider Plaintiff's eligibility for or grant benefits under these ERISA plans. Instead, Defendants have focused on challenging Plaintiff's ineligibility for benefits under the short term disability plan.

Absent a showing of futility or that the remedy available pursuant to an appeal through the plans directly is inadequate, the court will require Plaintiff to exhaust his administrative remedies with regard to the Special Severance Benefits Plan, Welfare and Fringe Benefit Plan, and the Retirement Plan. Accordingly, the court will grant summary judgment as to these claims.[11]

**3. Failure to Provide Information**

Plaintiff also alleges that Defendants Reynolds American and XYZ Administrators failed to provide information in violation of 29 U.S.C. § 1132(c). Section 1024(b)(4) of Title 29, United States Code, provides as follows:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary [of Labor] may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4). Section 1132(c) provides, "Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant of beneficiary in the amount of up to $100 a day." 29 U.S.C. § 1132(c).

Relief under § 1132(c) is punitive, rather than compensatory in nature. *Glavor v. Shearson*

[11] The exhaustion requirement applies only to Plaintiff's denial of benefit claim. The requirement does not apply to Plaintiff's remaining claims because these claims allege violations of the statute, ERISA, rather than violations of the specific plans at issue. *See Horan v. Kaiser Steel Retirement Plan*, 947 F. 2d 1412, 1416 n.1 (9th Cir. 1991) (citation omitted).

*Lehman Hutton*, Inc., 879 F. Supp. 1028, 1034 (N.D. Cal. 1994). "[T]he penalties provisions of § 1132(c) were intended to induce compliance by plan administrators." *Id.* (*quoting Paris v. F. Korbel & Brothers, Inc.*, 751 F. Supp. 834, 839 (N.D. Cal. 1990)). Thus, "Under § 1132(c) only the 'plan administrator' can be held liable for failing to comply with the reporting and disclosure requirements." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 633 (9th Cir. 2008) (*quoting Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000)).

On March 16, 2005, following his termination, Plaintiff sent a letter to R.J. Reynolds employees Judy Greenwell, Senior Benefits Administrator, Shannon Tremblay, Senior Management of Sales Employment Practices, and Ella Long, Senior Management of Employment Practices, requesting "all copies of records, documentation that supported the decision to terminate me. Specifically copies of records, documentation, that support the statement that I have misrepresented to the Company my medical condition and physical limitations . . . ." (Pl.'s Opp. Mot. Summ. J. (#128), Exs. 115, 116, 117.) In response to this request, Ella Long explained to Plaintiff the reasons for his termination, but did not provide Plaintiff with any documents.

On January 12, 2006, Plaintiff sent a written request to Ms. Long, seeking the name and a copy of "R.J. Reynolds/Reynolds American Employee Benefits Plan." (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 132.) On January 17, 2006, Jennie Beasley, Director of Corporate and Benefit Compliance, responded, informing Plaintiff she needed to know to "which kind of benefit plan (pension, medical, 401(k), disability, etc.)" Plaintiff was referring. (*Id.*) On January 27, 2006, through his attorney, Plaintiff again sent a letter seeking the requested information. On February 22, 2006, Ms. Beasley responded, identifying the employee benefit plans in which Plaintiff was eligible to participate prior to his termination. Ms. Beasley included in her response copies of each plan. In the letter, Ms. Beasley also informed Plaintiff that the plan administrator for each employee benefit plan is Defendant Reynolds American Benefits Committee. There is no evidence

indicating that Plaintiff requested information from this Defendant.

To be liable under § 1132(c), a defendant must receive a request for information. *Sgro v. Danone Waters of N. Am. Inc.*, 532 F.3d 940, 945 (9th Cir. 2008). Here, Plaintiff has properly named the plan administrator, Defendant Reynolds American Benefits Committee, as Defendant to his § 1132(c) claim. However, Plaintiff has failed to provide any evidence indicating that he requested or was denied information from the plan administrator. Accordingly, summary judgment as to this claim is appropriate.

**4. Equitable Estoppel**

In January of 1995, Defendant Brown & Williamson offered Plaintiff an employment position. It appears undisputed that when Brown & Williamson offered Plaintiff the position, they agreed that Plaintiff's previous fifteen years of employment with American Tobacco would count towards his years of employment with Brown & Williamson. Plaintiff alleges that in November or December of 2003, after announcing the merger with R.J. Reynolds, Brown & Williamson informed Plaintiff that he was not eligible for the "Rule of 60 " retirement plan because he was not an employee of record in 1994.

The Rule of 60 retirement plan provides retirement benefits for a "covered participant (1) who has completed at least 10 years of qualifying service and (2) whose age in full years on his date of actual termination of employment plus his years of qualifying service on such date equal at least sixty." (Defs.' Mot. Summ. J. (#115), Ex. JJ at RJ 1164.) To qualify for the Rule of 60, the employee must have been a participant in the Brown & Williamson Retirement Plan prior to July 1, 1994.

Defendants maintain that even if Brown & Williamson agreed that Plaintiff's hire date would retroactively be October of 1980, Plaintiff is nonetheless not eligible for Rule of 60 benefits because he was not a participant in the Retirement Plan prior to July 1, 1994. Brown & Williamson did not acquire American Tobacco until 1995. More importantly, American Tobacco's

retirement plan was maintained separately until December 31, 1998, when the Brown & Williamson and American Tobacco retirement plans were merged. Thus, it appears that the only evidence upon which Plaintiff relies is that in 1995 a district manager of Brown & Williamson allegedly told Plaintiff that his years of services with American Tobacco would be counted towards all benefits with Brown & Williamson.[12]

"An ERISA beneficiary may recover benefits under an equitable estoppel theory upon establishing a material misrepresentation, reasonable and detrimental reliance upon the representation and extraordinary circumstances." *Pisciotta v. Teledyne Indus*., 91 F.3d 1326, 1331 (9th Cir. 1996) (citation omitted). In addition, to establish a claim of equitable estoppel, the Ninth Circuit requires (1) the provision of the plan at issue to be ambiguous such that reasonable persons could disagree as to their meaning and effect and (2) the representations must involve an oral interpretation of the plan. *Id.* (*citing Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821-22 (9th Cir. 1992).

Plaintiff has failed to demonstrate genuine issues of material fact concerning his equitable estoppel claim. Even assuming that the district manager specifically informed Plaintiff that his years of service would be counted toward his qualification for benefits under the Retirement Plan, Plaintiff has failed to identify the necessary extraordinary circumstances to support a claim of equitable estoppel. He has shown at most a single instance of Brown & Williamson misrepresenting its coverage, rather than a series of continuing false assurances. Moreover, Plaintiff has failed to allege or cite to evidence indicating that he relied on the alleged misrepresentation in choosing to undertake employment with Brown & Williamson. *Cf. Spink v. Lockheed Corp.*, 125 F.3d 1257, 1262-63 (9th Cir. 1997) (finding estoppel where (1) employer

[12] Defendants argue that this statement is inadmissible hearsay. Plaintiff counters that the statement is a party admission exempt from the hearsay rules pursuant to Federal Rule of Evidence 801(d)(2). However, the court need not decide the issue. Even assuming the statement is admissible, as discussed below, Plaintiff has failed to demonstrate a genuine issue of material fact concerning the equitable estoppel claim.

lured employee away from a competitor in part through inaccurate promises regarding employee's eligibility for retirement plan, and (2) for three years employer issued statements reflecting benefit accrual despite employee's ineligibility). Accordingly, summary judgment with regard to the equitable estoppel claim is appropriate.

**5. Wrongful Discharge**

Plaintiff alleges Defendants "terminated Plaintiff for exercising his rights under his employee benefit plans and for the purpose of interfering with his attainment of any rights under [the] plans" in violation of 29 U.S.C. § 1140.[13] (Fourth Am. Compl. (#109) ¶ 87.) Under § 1140, it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provision of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. Thus, § 1140 provides two separate types of protection. First, the section protects against discharge designed to block the vesting of rights under benefit plans. Second, the section protects an employee from facing retaliation for exercising his rights under a benefit plan. Here, the complaint alleges both wrongful interference and retaliation claims.

As a preliminary matter, the court finds that Plaintiff's retaliation claim must fail. Plaintiff argues Defendants terminated him for exercising his rights under the short term disability plan. Section 1140 prohibits an employer from retaliating against an employee for exercising any right to which he is entitled under the provisions of an "employee benefit plan, this title, [29 US.C. § 1201], or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140. As discussed above,

---

[13] Although Plaintiff identifies "Defendants" generally in the claim, § 1140 applies by its terms only against "persons," defined by ERISA to exclude benefit plans and benefit committees. *See* 29 U.S.C § 1002(9) ("The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, or employee organization."). Thus, R.J. Reynolds, as a corporation and as the successor in interest to Brown & Williamson is the only Defendant against whom Plaintiff may assert the claim.

the short term disability plan is not an "employee benefit plan" within the meaning of ERISA, and Plaintiff does not allege that the short term disability plan otherwise falls within one of the remaining identified categories. Thus, Plaintiff's retaliation claim fails.

To establish wrongful interference, the plaintiff must demonstrate that his employment was terminated because of a specific intent to interfere with ERISA rights. *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) (citations omitted). Accordingly, "no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination." *Id.*

Plaintiff argues Defendants' specific intent can be inferred from Defendants' conduct and the questionable basis upon which Defendants based their decision to terminate Plaintiff. As discussed above, from the time Plaintiff began short term disability leave in June of 2004 to his termination in March of 2005, Defendants required Plaintiff to undergo physical examinations and assessments on three separate occasions by three different physicians. Each physician concluded that Plaintiff's physical state prevented him from performing the functions of his job. Defendants admit that they were dissatisfied with the procedures followed during and the results of each of these physical examinations.

Dissatisfied with the examination results, Defendants turned to surveillance tactics. After observing Plaintiff driving and exercising at the gym, Defendants terminated Plaintiff. However, at least one of the physicians hired by R.J. Reynolds noted that Plaintiff regularly exercised, and numerous other physicians specifically prescribed regular exercise as a part of Plaintiff's treatment. In addition, the doctors emphasized that Plaintiff could not perform the driving required by his job (driving approximately 800 miles a week), and not that Plaintiff was incapable of driving at all. While there is conflicting evidence regarding the extent of Plaintiff's exercise and driving, these are issues of fact inappropriate for resolution on a motion for summary judgment.

Thus, viewed in the light most favorable to Plaintiff, the court finds that Defendants'

repeated insistence that Plaintiff undergo physical examinations, the consistency of the results of the examinations, Defendants' refusal to accept the results of the examinations, Defendants' surveillance tactics, and Defendants failure to provide Plaintiff with any benefits, raise genuine issues of material fact regarding whether Defendants terminated Plaintiff for the purpose of denying him benefits to which he might otherwise be entitled. Accordingly, the court will deny summary judgment with regard to the wrongful interference claim.

**F. Defamation**

Plaintiff's seventh claim for relief alleges Defendants made statements regarding the reasons for Plaintiff's termination that were defamatory. Plaintiff contends that Defendants have "negligently and intentionally published said defamatory statements to Plaintiff's former co-employees, Plaintiff's customers and clientele, vendors and other third parties . . . ." (Fourth Am. Compl. (#109) ¶ 94.) Further, Plaintiff alleges that these statements qualify as "defamation per se," as the statements related to Plaintiff's fitness to conduct his business.

Generally, a defamation claim requires the Plaintiff to show the following: (1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Pope v. Motel 6*, 114 P.3d 277, 282 (2005). However, the court considers certain types of defamatory statements to be defamatory per se. These types of statements are actionable without proof of damages. Nevada has recognized statements tending to injure the plaintiff in his or her business or profession as defamatory per se. *Chowdry v. NLVH, Inc.*, 851 P.2d 459, 484-84 (Nev. 1993).

In response to the motion for summary judgment, Plaintiff has identified two instances where Defendants allegedly published defamatory statements.[14] First, Plaintiff identifies the letter

[14] Defendants assert that Plaintiff identifies a third publication to the Nevada Department of Employment during unemployment and worker's compensation proceedings. However, to the extent that Plaintiff asserted such a claim at one time, he appears to have abandoned it. As Defendants note, such

R.J. Reynolds sent informing him of his termination. This statement cannot support Plaintiff's defamation claim as it was not published to a third party.

Second, Plaintiff notes that on March 19, 2005, R.J. Reynolds employee Dr. Collins contacted the claims adjuster for Travelers Insurance, the insurance carrier for Plaintiff's 2003 worker's compensation claim. During the conversation, Dr. Collins informed the claims adjuster that through surveillance, Defendants "got some great video" on Plaintiff. (Pl.'s Opp. Mot. Summ. J. (#128), Ex. 122.) Dr. Collins then described the contents of the video. Dr. Collins later mailed the videos and the written report by the surveillance team to the insurance adjuster.

Defendants argue that statements made by Dr. Collins to the insurance adjuster constitute an evaluative opinion. The First Amendment protects statements of opinion, and such opinions are not actionable. *Lubin v. Kunin*, 17 P.3D 422, 425 (Nev. 2001) (citation omitted). To determine whether a statement constitutes a fact or opinion, the court asks "whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact." *Id.* "So long as it is based on true and public information, an evaluative opinion conveys the publisher's judgment as to the quality of another's behavior and, as such, it is not a statement of fact." *Id.* (*citing People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1275 (Nev. 1995), *overruled on other grounds*, 940 P.2d 134 (Nev. 1997)). In certain instances, a statement may be a mixed statement of fact and opinion. Such a mixed statement is actionable where it is "an opinion, which gives rise to the inference that the source has based the opinion on underlying, undisclosed defamatory facts." *Id.* (citation omitted). Where a statement is ambiguous, the question of whether it is a fact or an evaluative opinion is left to the jury. *Id.*

Here, the evidence presented indicates that Dr. Collin's statements to the claims adjuster

---

communications are absolutely privileged. *See Circus Circus Hotels v. Witherspoon*, 657 P.2d 101, 105-06 (Nev. 1983); NRS § 612.265(7).

were limited to statements of fact relaying the contents of the video rather than an expression of Dr. Collin's opinion. Indeed, the evidence indicates that Dr. Collins merely described what the video portrayed, without inserting his own opinion. The accuracy and genuineness of the contents of the video is not in dispute. Thus, the truthful statements relating to the admittedly accurate contents of the video cannot form the basis of Plaintiff's defamation claim. *See Ornatek v. Nevada State Bank*, 558 P.2d 1145, 1147 (Nev. 1977) (noting that truth is a defense to defamation).

Plaintiff also argues the court can infer that during the conversation Dr. Collins also advised the adjuster that Plaintiff had misrepresented his medical condition and physical limitation. Even if Plaintiff made such a statement, Defendants argue that the statement would be an evaluative opinion entitled to First Amendment protection. In *Berosini*, the court found a statement by a PETA member based on his interpretation of a videotape that Berosini had abused animals in the videotape was nonactionable in defamation. 895 P.2d at 1275. The court reasoned that "all facts upon which [the] opinions were based were 'disclosed' in the videotape itself." *Id.*

Similarly, here the evidence indicates that any statements Dr. Collins made to the adjuster were based on the videotape. Such statements would reflect Dr. Collin's judgment as to the quality of Plaintiff's behavior as observed on the videotape. The insurance adjuster was able to view the videotape and make her own, independent assessment of Plaintiff's behavior. Thus, the court finds that any such statement would be an evaluative opinion and could not provide the basis for a defamation action.

Plaintiff has failed to identify any other instances of publication. Accordingly, the court will grant the motion for summary judgment with regard to the defamation claim.

**G. Breach of Contract**

Finally, Plaintiff alleges that Defendants Brown & Williamson and/or R.J. Reynolds agreed, through a binding contract, that Plaintiff was entitled to salaried continuation payments pursuant to the short term disability plan. Plaintiff maintains that Defendants breached the short

term disability plan by terminating the short term disability payments.

Plaintiff contends that the short term disability benefits were a part of his compensation package. Plaintiff argues, "[The short term disability benefits] were part of Plaintiff's express employment agreement with Defendants whereby Plaintiff agreed to provide certain labor services in exchange for monetary compensation in the form of salary and benefits." (Pl.'s Opp. Mot. Summ. J. (#128) at 70.) The court has rejected this argument in the above discussion. Accordingly, the court will grant summary judgment with regard to Plaintiff breach of contract and breach of implied covenant of good faith and fair dealing claims.

**H. Motion to Strike**

After filing their Reply (#135), Defendants also filed an "Errata to Reply in Support of Summary Judgment" (#137) and an "Amended Statement of Undisputed Facts" (#139). In response, Plaintiff has filed a motion to strike both documents (#140). The court has not reviewed or relied upon either of the submitted documents in considering the motion for summary judgment. Accordingly, the court will grant the motion to strike.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (#115) is hereby GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiff's Motions to Strike (#140) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff shall have ten (10) days from the issuance of this order to amend his complaint as discussed herein.

IT IS SO ORDERED.

DATED this 10th day of March, 2009.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE